Good morning. May it please the court, my name is Sarah Norman from the U.S. Attorney's Office for the Southern District of New York on behalf of the defendants. The defendants in this case are entitled to qualified immunity, even under Mr. Ganek's theory of the facts, which the defendants dispute. A magistrate judge would have authorized the very same search that occurred here. It is not contested that investigators had reason to believe that four individuals at the fund, including Mr. Ganek and his co-founder, received and traded on inside information. Whether or not Mr. Ganek himself knew the sources of that inside information, given his undisputed trading activity and his central role at the fund, he was at the heart of the criminal activity, the suspected criminal activity that was under investigation. Let me ask you so that we understand. We have to assume, in applying the corrected affidavit doctrine, that the magistrate judge or the judicial officer was told that the cooperator said he had not told Mr. Ganek that the information was inside. At that point, what are you looking into his computer, his phone, for? For evidence, Your Honor, of insider trading by his three colleagues. Even under the most... And that would be on his computer because... It would be on his computer... By his computer, I mean all his electronic devices. Yes. This was a search of a workplace, and Mr. Ganek is alleged to have been actively and directly involved in the trading that was under investigation. Let's assume, even under the most generous reading of the complaint, that the corrected affidavit specifically said that Mr. Ganek had told investigators he had no inkling of the inside sources of the information. Still, the affidavit, based on the uncontested allegations, would have made clear that he received the information, he traded on the information, and caused potentially others to trade on the information. That three individuals at the fund not only received and traded on the information, but knew about the inside sources of the information. And the... It's not... Are there any specific allegations in the affidavit about Mr. Ganek other than the disputed passages from... About Adendakis? No, Your Honor. The allegations regarding Mr. Ganek are in paragraph 13, and paragraph 11. But it is very clear from... The only statements in those two paragraphs that Mr. Ganek contests is really just one statement that appears twice. That... The only statement that's contested is that he knew the sources of the inside information he was trading on. So those paragraphs still do contain uncontested information that gives rise to probable cause to search his office files and electronic devices for evidence of crimes by the three other individuals at the fund who, it's uncontested, there was probable cause to believe that they were engaged in a scheme. Are you saying that the scope of the affidavit, the scope of the search that was authorized would not have been affected as well by the deletion of those, or the corrected statement that he did not know? Absolutely, Your Honor. It would have been the same search. And the reason for that is the search is a search of locations, and the probable cause is a probable cause to believe that locations are likely to disclose evidence of a crime. It matters not that an individual whose files are searched themselves are suspected of criminal activity. That's clear from the Supreme Court's decision in Zurcher on down. Here, given Mr. Ganek's admittedly central role in the firm, and more importantly, his role in the trading activities that were under investigation, there's no dispute that he received the information and traded on it. So he is at the heart, at the center of the investigated activities, even if he's completely unwitting. The question is whether his activities are evidence of a crime. So let me ask you a few questions to understand your position, and then that way we can make sure that the appellee addresses them. Is it your position that if indeed Mr. Ganek had no knowledge, that you would be entitled to search his computer as you did because his trading is somehow evidence of criminal conduct by the cooperator in having given him the information? The cooperator in having given him the information, as well as the co-founder, Mr. Chiasen, and a fourth-level global employee, all of whom... How are their activities, how are they involved in criminality when Mr. Ganek unknowingly trades? The investigators were investigating their criminality. The investigators were investigating the trades at issue to determine whether they were unlawful. To see if Mr. Ganek knowingly traded? No, Your Honor. No? No. Under the corrected affidavit analysis, the Court has to, we're prepared to accept the most generous reading. That is what I was asking you to accept, to accept that he did not know. You're saying you nevertheless would be entitled to search because, and let's just stick with the cooperator to make it simple. The cooperator giving inside information to a person who then unwittingly trades, the cooperator has what, aided and abetted the Your Honor, the cooperator in that scenario would be liable for causing Mr. Ganek to trade on the information. So that would have been a crime in and of itself. And that in fact was one of the crimes that was being investigated. Mr. Adnakis received inside information, it's uncontested from insiders at public companies, provided it to Mr. Ganek, Mr. Chiasen, and a fourth employee. Those employees all then traded on the information. So even if we just limit it to Mr. Adnakis, his crime is causing Mr. Ganek, even unwittingly, to trade on that information. How does the cooperator benefit from giving the information to someone who unwittingly trades? I mean, you know, presumably he unwittingly trades, he benefits, but he doesn't know he's traded on inside information. But the person who gave it to him did. And as I understand, it doesn't get any kind of kickback from the trade. Doesn't there have to be some benefit to the tipper? Well, there certainly would have been in this case. I mean, Mr. Adnakis worked for Mr. Ganek, and his job was to provide useful information. So that's the, that's the government's theory that wittingly or unwittingly, as Mr. Ganek may have been, the cooperator providing the information was involved in criminal activity. Absolutely, Your Honor. And that's what, that's what you're saying you would have been allowed to search for in any event? Not, not only for Mr. Adnakis's suspected criminal activity, but also that of Mr. Chiasen and the fourth level global employee. How did people's criminal activity show up on Mr. Ganek's electronic devices? Because they were all, they were all working on the trades together. I mean, Mr. Ganek was the centerpiece of the, even according to his own complaint, uh, was the center, the key person at the firm. And he, the allegation is that this was a concerted effort over a long period of time to obtain inside information from third party consultants and firms and to trade on it. Uh, and so. We were going to be strict about the red light, but we're going to give you another two minutes because I want you to address your, your view on supervisory responsibility here. You have a number of supervisors who are sued. We do, Your Honor. And I appreciate the opportunity to do that. Uh, the complaint pleads no facts, uh, from which it could be plausibly be inferred that any of the nine supervisory defendants had ever had any knowledge of any misstatement in the warrant affidavit, much less deliberately or recklessly caused that statement to be, uh, submitted to a magistrate judge. And again, we dispute that the warrant affidavit contains any false statement at all. But even assuming that that had been pled, there's no allegation of notice that is supported by sufficient factual support to meet the Iqbal standard. The judge thought that it was plausible given the statements that were made about how carefully decisions about the case had been considered, et cetera, that you would think this had all been discussed. What's your response to that? That's incorrect, Your Honor. Those types of allegations could be made in virtually any case and certainly in any high profile matter, uh, that supervisors were briefed on a case, that supervisors were involved in key decisions, uh, and, and the court needs to use, as Iqbal indicated, sort of common sense judicial experience, uh, to, to determine what level of factual involvement, of factual amplification needs to be identified in a complaint to make an allegation. As we consider that, is the thing we have to assume it was plausible they were briefed on that would be that the cooperator had said Mr. Gannick didn't have information, but that the warrant affidavit was going to say that he did? Is that, is that the fact they would have had to have been briefed on? Because, you know, I mean, the United States Attorney's statement suggested that he had been involved in conversations about the case, but I'm wondering whether what we have to find it plausible they were told was that there was going to be a lie in the affidavit. Exactly. Exactly right, Your Honor. It's, we're certainly accepting for, for purposes of the, the Rule 12b-6 motion that, that the supervisors were briefed. It was high profile. The U.S. Attorney and other high, high level officials were involved in key decisions, but what the court has to determine is, is it not merely possible, is it not merely a sheer possibility, but is it plausible that the, the supervisors would have been told by their subordinates that there was a fabrication in a warrant affidavit? There are absolutely no facts from which, from which that could be plausibly inferred on this complaint. Either the briefing did not reach the level of detail to talk about the specifics of the warrant affidavit, or if it did, that it's as likely as not that they would have been told that the cooperator had made the statement that was then reported in the affidavit erroneously? No, Your Honor. I think, I think the question is whether Mr. Gannik has pled that it's more than a sheer possibility that this could have happened by virtue of briefings. You have to, you have to determine whether the allegation that this would have been conveyed in the manner that's being supervised by higher level supervisors, that, that their subordinates would have, would have sort of run up the chain, as the district court put it, a decision to fabricate evidence. That is not, that is not plausible, and there are no facts to support that here beyond the, the facts that are alleged about briefings and the like, which again could be made in any case. Thank you, Your Honor. We have served time. Thank you. Professor Gartner. May it please the Court, my name is Nancy Gartner. I represent David Gannik. Government's argument is extraordinary. To some degree, they're saying that the lie didn't matter in this case, that qualified immunity should cover the lie didn't matter. The lie wouldn't have mattered if it conceded for the purposes of this argument that there was a lie, that the lie wouldn't have affected the scope of the search, for example, that it wouldn't have affected what they looked at. The, the corrected affidavit methodology is a way of determining whether or not the lie was material. You don't even have to go there in this case. It was plainly a material misrepresentation in an affidavit. It is literally the only paragraph in the entire search warrant that speaks to David Gannik at all, not the wire intercepts. Our inquiry ends with the materiality of it. Assuming materiality, isn't the question whether if you take it out, the rest of the information is enough to support probable cause? That is the way the Court has characterized it. There's a case called Galena v. New Haven in which the Court had said that the material, a material misrepresentation strips away the fact that there was a lie, and then lots of other information which is true. And the corrected affidavit's ---- Roberts, here in paragraph 11, it says that Gannik was trading on inside information. Why would, is that not enough to create probable cause for the warrant? Because the, let me, I want to focus the Court's attention first of all on the scope of this warrant. This is an affidavit that you're not going to, you're not only going to have to correct taking out the lie, but you're also going to have to redo the scope of the warrant. The government describes this as if it was a search for computers. Indeed, the search was for a search of any and all financial records, handwritten documents, letters and correspondence, any and all information about public companies, A and B to the search warrant that was the scope of search for Gannik's search, was, ladies and gentlemen, everything in his office. The government says this was not, as they describe it, an all-business search. In other words, a search where the entire business is fraudulent, and so therefore you have a right to look at everything. In fact, they did. Well, the government says Mr. Gannik was trading on inside information. But they recognize that he was not trading on inside information necessarily fraudulently. He, the, the ---- Why is that determinative here? I mean, if the government has the right to look for both instrumentality and results and fruits of fraud, if Mr. Chiason was correctly identified in the affidavit and the cooperator's testimony generally could be relied upon, the information that there was inside information that was being traded on, and even if Mr. Gannik was not, wasn't that relevant information and evidence of the wrongdoing? Two answers to that. First of all, the only information that is in the search warrant that they had was with respect to information on the servers and on Adendakis's computer. But is that an argument that you would have had even if they'd had probable cause, even if there had not been a misrepresentation? Oh, absolutely. No, absolutely. And, and my understanding is that that's not the focus of your brief on this appeal. It's whether or not there was, whether or not this statement allowed them to search at all. So let's get past that hurdle first. What's, the government says they would have been allowed to search at least for any evidence that related to his trading on this inside information But the scope of this warrant is far beyond even that. They, before you get to scope, which as I said, I'm not sure it's the focus of your brief, but in any event, before you get to scope, tell me why they couldn't search for any evidence that relates to the trading by Mr. Gannik on the inside information. One of the things we allege on our complaint, which is certifiably true about, about hedge funds, is that they trade on all sorts of information. The implication of the government's position would be that if a guy in the mailroom is trading on inside information, you have a right to search the entire business. That makes no sense. You're not going to leave scope, huh? Well, I, because the All right, make your argument. Well, the argument, and that was in Paul, Judge Pauly's decision as well. He said that a neutral, would a neutral magistrate, and that's the inquiry, have given a warrant, had to have agreed to a warrant under these circumstances, uh, with respect to an unwitting participant. In one of the other warrants that was, uh, affected the same day by the midday with respect to the Diamondback operation, it was only the offices of those, offices of those people were implicated, nobody else. So If, you know, the stolen item is in an unwitting participant's home, you get to search and seize the item. But you, I So, we have to stick with here that they have evidence that a cooperator gave Gannick inside information and Gannick traded on it. And, and were, are those two facts alone enough to support this search warrant? No, they are not. The model here is the, the Zurcher case, which is the case of the, uh, the press had no problem, was not a participant in any crime. It was just that there was evidence or photographs that were evidence of, uh, crime that they had a right to, to search for. But here's where the scope of search, with all respect, Your Honor, and the fact of search merge. You have a right to go into the innocent third party, but only with respect to specific items. In other words, what the problem about this search is that this was treating Mr. Gannick as if he were the same as the others as to whom there was probable cause and, and clearly the inquiry here is whether a neutral magistrate would have given the right to search at all and of that scope, which this court has found by the way to be an issue for the district court and not an issue at this point. The, the, the, the enterprise of salvaging this warrant as to someone who was lied about turns, uh, qualified immunity on its head. Qualified immunity, the whole notion is to give the government the benefit of the doubt for reasonable mistakes, uh, that they could not have reasonable and fair mistakes. There is nothing about this search warrant and the scope of the search and the fact that he would be an unwitting participant, you ask the question, would it have made a difference to a neutral magistrate, uh, that he was not involved? Would it have made a difference? And the answer is yes, it could have made a difference and that's an issue for the district court. Would it have entitled them to a search at all? I think the answer is no, uh, because the information they needed were already on the service of the others and would they have been able to have a search of the scope that they did? And I think the ambiguity about it, uh, that is an ambiguity that needs to be resolved in the district court. Uh, under these circumstances, this really would enable a search of, of every business for every shred of evidence for every piece of information. If some guy in a corner office is trading on it in these days of computers, you don't need to do that. There was no necessity for that here. The guy's servers and electronic equipment, not the whole office. We're now talking about the guy who's trading. Right. But they had, they, they had, when they walk into Chazon's office or they walk into the office of the others, they had access to Level Global's computers and they had access to Adendakis's, uh, computer. This is a search that they had given the, the inside information to Mr. Gannick and that communication is further evidence of a crime. But whatever the map, the search has to map onto the probable cause. And this is the kind of situation which, if this course ratifies a search of this kind, would really eliminate whatever the nuances that we look at with respect to probable cause. The information that they needed were already in the offices of the others. They, this doesn't entitle them to cross the threshold of David Gannick's office and certainly not to cross the threshold of David Gannick's offices for the information that they sought. And it was crossing the threshold of David Gannick's office and walking out with boxes of materials and leaking it to the press that caused the damage here to suggest that there is no remedy for what was a patent lie, it seems to me, would really, uh, uh, turn, uh, qualified immunity on its head. And I might add, at the very least, we're at a motion to dismiss stage. The issues with respect to what a neutral magistrate would have done are issues for the district court. Uh, uh, who knew what in the line of command is an issue for the district court? Uh, we have alleged on the supervisory liability issue that this was a case in which the top of the office insinuated himself into the, into this, uh, situation that what happened with . . . It's possible to think that all of these supervisors whom you've named as defendants knew that the government was submitting an affidavit with a falsehood in it. I mean, I would think it's just plausible that they were given the same false information the magistrate was given. Um, the reason it's not plausible is this. There are at least three occasions, uh, on which they were asked to clarify the situation and didn't. When, um, and this is all the way up the chain of command. That assumes they knew that it was a lie. I mean, is there, is there any allegation, uh, that, um, any of the supervisors knew the affidavit had a lie in it? Yes. We have alleged that in our complaint. Yes. Well, you've alleged it in a conclusory fashion. Is there anything that you've pointed to in the complaint to support that? We have alleged that, uh, that, in fact, there are two admissions that at least Mr. Zabel made and, and our, Mr. Perara made after the fact saying that the affidavit had been reviewed at the highest levels. You never have that in a case. I'm not sure anybody said the affidavit had been reviewed. Did I miss something? No. Mr. Perara said the consequences of the government's actions had been carefully considered, which is forward looking rather than backward. But what am I missing? Who, who referenced the affidavit? Well, Zabel, Mr. Zabel said that the case had been reviewed at the highest levels. That's something different than saying the affidavit had been reviewed. He said the case had been reviewed. But, but Which gets us to Judge Chin's point that that could be reviewed having no reason to think that the affidavit was false. But let me, let me back up. Is it plausible that the line assistants presented the affidavit to the supervisors and said, here, review this, and by the way, it contains a lie? If I can step back with just a narrative answer to that. Gannik was the person they wanted to find out about. The notion that at the debriefing of Mr. Adendakis, when five individuals were in the room, and when Adendakis said, I can give you X and Y, but not Gannik. The notion that that was then not a significant fact that didn't go up the line is extraordinary to me. It is far more plausible that it was well understood that they, that they couldn't get Gannik at that moment. The question is, who knew at that moment, at the time the affidavit was signed, who then knew a month later when Gannik said, you've got this wrong, this is outrageous, you've got this wrong, and that someone didn't review it at that point. Zabel said it has been reviewed at the highest levels. And then again in February, there's a conversation with Mr. Berrara, in which he says, no, we're not going to address this. They don't re-interview Adendakis until a week after Level Global fails. I know your time's up, but I have one question that's a little unrelated. I want to make sure I understand your position on, assuming we agree that your Fourth Amendment claim is, should go forward, that the district judge correctly ruled on that, can you tell me what your Fifth Amendment procedural due process claim adds? Specifically, can you win the Fifth Amendment search warrant challenge? I don't see what it adds to the case, but I may be missing something. You can win the Fifth Amendment claim without the Fourth Amendment challenge, and the reason is this. This Court has, the Fifth Amendment violation is complete with a material misrepresentation in the search warrant that influenced, didn't have to be categorically result in, but that the warrant. There are cases under the, in other words, the harm is not part of the Fifth  The harm is not the issuance of the warrant? The issuance, yes, it could be the issuance of the warrants, except— So if you've succeeded on the Fourth Amendment in saying this warrant is invalid, how do you, why do you need the Fifth Amendment claim? Because the question under the Fifth Amendment, as in the Ricciuti case, is did the, is the warrant influence the subsequent actions? Did it influence? It clearly influenced here. Influence what subsequent actions? In other words, the issuance— Not the warrant. Under the Fifth Amendment, it's simply the issuance of the warrant. Well, you see, I don't understand that, because the, I would think the, you were, you had property taken without due process. Why? Because it was taken on, without a valid warrant. And so the two claims seem to be identical to me. It's entirely possible that one could analyze it like this. The process of putting a lie in a search warrant, like the process of lying during a trial, is an independent Fifth Amendment violation that made a difference, even if not one-to-one to the outcome, but made a difference. The Fifth Amendment is all about the integrity of the proceedings. The, this Court has said in other cases that harm issues are, for the district court, the, the constitutional violation is the lie that was important in the proceeding, even if not the— There would never be a corrected affidavit doctrine. There wouldn't be with respect to the Fifth Amendment. No, but why would there be for the Fourth Amendment if, if the, it matters not a bit, because the, even with the correction, there's a Fifth Amendment violation. Because the Fourth Amendment constitutional violation is about probable cause and a bad warrant. That's baked in— Without which you, you have had property taken without the due process that the Fourth Amendment gives you. It may be a, a, a, a, a, a critical point here. In the Fifth Amendment cases, as in Ricciuti and Morse, et cetera, there was a lie, for example, in a trial, and the person was acquitted. That's quite different, because there's no Fourth Amendment that, it's not the Fourth Amendment that gives the process. You have a separate process right. Well, the question is whether there's an independent right not to have people lie about you in a warrant, and then the trial would be about the relationship between that lie and what happened to you. So that the trial, the, the issue of harm is an independently litigated issue before the district court. The case that says that a lie in a warrant, a search warrant, is both a Fourth and a Fifth Amendment violation. We, we have only the three, the cases that we, we have mentioned. Well, to the extent it's not clearly established, you would have another, another qualified immunity problem in pursuing the Fifth Amendment claim. The notion that it shouldn't be a qualified, that it's a qualified immunity question, that to have someone lie in a search warrant every day is extraordinary. Even if it's, even if it's not a Fourth Amendment violation, it's a Fifth Amendment violation, and I'm not sure where that's clearly established in law. It might be what we ultimately conclude, but I don't see it as clearly established at present. I think it's a fair inference from those cases that talk about the integrity of the proceedings. All right. Thank you very much. If I, I just want to have one, one ending comment, if I might. Quickly. Um, the notion that there is no remedy for officers of the United States to lie in an affidavit is, is extraordinary. This is the only remedy. This is about accountability. The search, a neutral magistrate, no judge would have offered, would have allowed anyone to step into the threshold of an unwitting participant's office, and certainly not on the scale that they did. Thank you. I, I'd just like to say at the outset, we certainly do not concede that there was any false statement in this warrant, warrant affidavit. The, the entire theory of, of a fabrication in, in the affidavit is based on a misreading of the affidavit, and, and there was no false statement. But for purposes of the corrected affidavit analysis, we're prepared to accept the most generous reading of the complaint. And if you do that, there clearly is probable cause to search Mr. Gannick's office files and electronic devices for evidence of crimes of others. And what about Professor Gertner's closing comment about the availability of a remedy for a deliberate lie in a warrant affidavit such as that has the reputational and other injury that they allege to have ensued from this search? Your Honor, I think, I, I, the case law in this, in this court is very clear that where, the, where there is, even in cases where, where a lie is alleged, even in cases where it is alleged that there's a false statement in a warrant affidavit, if the corrected affidavit, a hypothetical corrected affidavit would have provided probable cause for the search, there is no, there is no Edward's 175 F third 99. And in other cases of this court, there is no, no constitutional violation. And the defendants are, are entitled to qualified immunity. And, and I would add that, you know, to put defendants, law enforcement officers to the burden of defending against claims like this and, and proving that in fact there was probable cause in the warrant, there was no false statement imposes an enormous burden on law enforcement officers and on the public. You know, this isn't as simple a case as you're trying to portray it. You had the cooperator and an FBI agent on the stand at trial saying that the cooperator had not said in advance of the case that, um, that Mr. Gannick knew about the, um, the information being inside information. Now I know you want us to read the affidavit as pertaining only to the Dell, um, trade, but certainly there's no evidence at trial or in the record that you've put forward that the C, the confidential informant or the cooperator ever said that to the, uh, to law enforcement that Mr. Gannick did know that he was trading in whole or in part on inside information. That's the record we've got before us that a statement made in the affidavit is not true. We certainly disagree with that because the, how do you disagree with it? What's in the record to support a contrary conclusion? What's in the record, Your Honor, is, is the affidavit. Um, and Mr. Gannick certainly alleges and, and all the trial testimony in 2012, if you look, Your Honor, at paragraph eight of the affidavit, 8A, in paragraph 8A, Mr. Adendakis is, uh, there is a recitation that Mr. Adendakis was intercepted on, uh, a wire trans, uh, intercept, which, in which he was overheard discussing with an individual who was an insider. Uh, the specific company is, is, uh, redacted here. It's not Dell, which is unredacted elsewhere in the affidavit. What page of the appendix are you on? Sure. I'm on page JA 80. Sure. Um, and so here we have Mr. Adendakis receiving, uh, inside information as defined in the affidavit, a material non-public, uh, information about a public company from an insider. We have, uh, and that's not Dell. In paragraph 8C, and the, the fact that he knows that it's inside information is evident from what? The fact that Mr. Adendakis? No, that Mr. Gannick knows. Well, you, then you have to go to paragraph, uh, 13, where, uh, I recognize that where it says that Mr. Adendakis, uh, told Mr. Gannick the sources of the inside information. Now, their allegation, Mr. Gannick's allegation that that statement is false is based entirely on the trial testimony and on the allegations that Mr. Gannick told investigators that he never told Mr. Gannick the source of the Dell information. That is not. At a minimum, isn't the assertion that this was a lie plausible? We don't think so, your honor. We don't think so. We're prepared for purposes of the corrected affidavit analysis. On your, the point that you were, you were just making that there, certainly there, there could be a conflict reading this, uh, objectively. We don't think it's plausible because all of the allegations about the fabrication, if you look at the key allegation in the complaint, alleging that there was a fabrication, that's out, that's paragraph 76 of the complaint. It is specific to Dell and it's very clear. This is a 37 page affidavit and it, it contains a wealth of information about inside information. This case goes forward. Mr. Adenakis is going to testify that he did tell him that other, other trading, um, other information he gave him was inside information. I can certainly represent that we will present that case in the district court. That's what you'll present that Adenakis will say that he, he did tell him that certain information was, was inside information because I find it very curious that you, you didn't elicit that at trial. Your honor. The burden of proving knowledge, Mr. Gannick's knowledge at trial. Your honor, that trial was about one, one tip. It was about one, one, a piece of inside information as to Dell that was, that was traded on this affidavit. If you look at the complete affidavit is about a scheme with regard to many, many pieces of inside information from many public companies in paragraph eight, talking about information that Mr. Chiasen and the fourth level global employee got from, uh, from a third party consultant, there are as many as nine other, uh, public companies that are referenced. And for purposes of this argument, we are going to assume that it's a falsehood. What's your argument in response to, um, your adversary scope challenge that, that there was just no need to conduct a search of this scope. If, uh, the, uh, there was no, no allegation of knowledge of the inside information. It's, it's inconsistent with Zurcher. And this, this search was targeted for the locations because it, it suggests that you need, in order to search Mr. Gannick's office files and devices, you would need to believe that he was a winning participant in crime. Zurcher absolutely rules that out. What Zurcher says, why do you get to go through basically all of his emails? Uh, the re first of all, the, the affidavit does contain limitations. It's not overbroad. It identifies specific categories of information where it's likely that, that evidence of a crime will be found. It, it limits it to, to communications among these individuals and among, and with third party consultants, it limits it to information about, uh, public companies and other information specifically related to the crimes under investigation. It's not, uh, as broad a search as is being suggested. I do want to address the notion that they didn't need to go to Mr. Gannick's office because they could have gone to Mr. Jason's office. Uh, the government in order to, uh, to prove, uh, uh, uh, that a crime was committed by Mr. Adendakis would have had to show that the information that Mr. Gannick himself ultimately traded on was based on the information he got from Mr. Adendakis. By going and looking at Mr. Gannick's materials with regard to that, you find out whether there was an independent basis for those trades or whether as was suspected, in fact, it was the original tip. You wouldn't be able to get that from, uh, from other offices. And I would add that Mr. Gannick, Mr. Adendakis had left the firm at that time. Uh, so it may very well be that the only information was, uh, was available in Mr. Gannick's office. Thank you. Thank you, Your Honor. Thank you both. We're going to take the case under advisement.